IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KENNETH D. MERRITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.  05-4113-JPG |
| ) | |
| UNITED STATES OF AMERICA, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

This matter comes before the Court on defendant Union County Hospital District's (UCHD) motion for summary judgment (Doc. 65).  The plaintiff, Kenneth D. Merritt (Merritt), has responded (Doc. 67) and UCHD has replied to that response (Doc. 68).  For the following reasons UCHD's motion for summary judgment will be **GRANTED**.

**BACKGROUND**

**I.      Merritt's Claim**

On Saturday, March 22, 2003, Merritt was prying a nail when a piece of it broke off and struck him in his right eye.  Dr. William Ribbing (Ribbing), an emergency room physician at Union County Hospital (owned by UCHD), treated Merritt on the day of the injury.  Merritt contends that Ribbing was acting as an agent of UCHD when he negligently diagnosed and treated his injury and that his negligence – as well as the negligence of several other doctors – caused the loss of his eye. Merritt claims Ribbing deviated from the standard of care by failing to acquire a complete history of the care Merritt received from another doctor, failing to recognize the significance of the injury,

failing to perform appropriate diagnostic procedures, failing to make a proper diagnosis of the injury and by treating the injury improperly. UCHD claims it has immunity from this claim under the Local Government and Governmental Employees Tort Immunity Act (Tort Immunity Act), 745 ILCS §§ 10/6-105 & 6-106(a).

## II.   Facts

Construing the evidence in the light most favorable to Merritt, and drawing all reasonable inferences in his favor, the admissible evidence establishes the following facts:

After Merritt was injured, he went to see his family physician, Dr. Charlot. Charlot examined his eye and observed a scratch or corneal abrasion; Charlot referred him to Dr. Michaelis Jackson, an ophthalmologist practicing in Carbondale, Illinois. Merritt's family drove him from Charlot's office in Cairo, Illinois to Jackson's office, but by the time they arrived, Jackson had left. On his way home, Merritt stopped at the emergency room at the Union County Hospital and saw Ribbing.

Merritt told Ribbing about the events of the day: that part of a nail had struck him in the eye, that Charlot saw a scratch or corneal abrasion and referred him to Jackson, that Jackson was not at his office and that he had stopped at the ER to get some pain medication for the weekend until he could meet with Jackson the following Monday. (Ribbing Dep. at 7). Initially, spasms in Merritt's eye made it difficult for Ribbing to perform an examination. Ribbing applied tetracaine, a topical anesthetic, which stopped the spasms and allowed him to begin his examination. At first, Ribbing did not see signs of significant injuries – all he saw was dye residue left over from Charlot's examination. Upon closer inspection, he observed an abrasion over the central portion of the pupil. (Ribbing Dep. at 8-9). Based on Merritt's history and his examination, Ribbing concluded that the

nail did not cause a perforation and that nothing was in the eye; in his words, the possibility of a penetrating injury "was nil." (Ribbing Dep. at 32).

Ribbing ruled out a perforation or penetrating injury – and decided that no further tests, and no referral, were necessary – for a number of reasons. First, as "a large piece of nail" hit Merritt in the eye, Ribbing would have expected to see "more substantial damage" had the nail actually pierced the eye. (Ribbing Dep. at 10). Second, he relied on the fact that Charlot had seen nothing more than a corneal abrasion. Third, given the size of the nail, he would have expected it to be clearly observable had it been in the eye. (Ribbing Dep at 10-11). Ribbing gave several slightly more technical reasons as well. In any event, Ribbing did not perform any additional diagnostic tests or refer Merritt to a specialist. (Ribbing Dep. at 15). He told Merritt that he had a corneal abrasion, placed an antibiotic ointment (gentamicin) in the eye, placed a patch on the eye, gave him pain medication and told him to come back to the emergency room the next day for a follow up. (Ribbing Dep. at 20). Merritt denies that Ribbing told him to come back the next day. Whatever the reason, Merritt did not go to the emergency room on March 23.

On March 24, Merritt went to see Jackson. After conducting a number of tests, Jackson diagnosed a perforated globe with endophthalmitis – "the most severe infection [one] can acquire . . . imbedded in all layers of the eye" – and a retained intraocular foreign body. (Jackson Dep. at 20). Jackson felt Merritt needed to see a retinal surgeon immediately and referred him to a doctor in St. Louis. (Jackson Dep. at 43). Merritt eventually had his eye removed by a surgeon in St. Louis.

## ANALYSIS

I.     **Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine dispute of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

If the moving party meets its burden, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000).

**II.     UCHD's Immunity under the Tort Immunity Act**

UCHD disclaims liability pursuant to two provisions of the Tort Immunity Act, 745 ILCS §§ 10/6-105 & 6-106(a).[1] As immunity under the Act is an affirmative defense, UCHD bears the

---

[1] The parties do not dispute that UCHD is a local public entity for purposes of the Act.

burden of proof. *Michigan Ave. Nat. Bank v. County of Cook*, 732 N.E.2d 528, 535 (Ill. 2000).

Section 6-105 reads thus:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

Section 6-106 provides as follows:

> (a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.
>
> (b) Neither a local public entity nor a public employee acting within the scope of his employment is liable for administering with due care the treatment prescribed for mental or physical illness or addiction.
>
> (c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.
>
> (d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.

At the margins, these provisions have proven difficult to apply. Generally, however, they mean what they say: "section 6-105 provides immunity from liability to a local public entity and its employees who have failed to make a physical or mental examination, or who have failed to make an adequate physical or mental examination" and "Section 6-106(a) grants . . . immunity from liability for injury resulting from . . . a diagnosis that a person is afflicted with a . . . physical illness . . . [,] failing to diagnose that a person is afflicted with a . . . physical illness . . . [,] and/or . . . failing

to prescribe for a . . . physical illness." *Michigan Ave. Nat'l Bank*, 732 N.E.2d at 535-36, 538.

UCHD asserts that "the gravamen" of Merritt's claim against it is Ribbing's "failure to perform a proper or adequate examination that led to the failure to diagnose" Merritt's injury. (Def.'s Mem. Supp. Summ. J. at 6). In support of this claim, UCHD points to the deposition testimony of Merritt's experts: Dr. Mark Hauswald, Dr. David Birnbaum and Dr. Andrew Dahl. Dahl, a certified ophthalmologist, testified that Ribbing "was negligent when he examined and treated [] Merritt . . . in that he failed to make the proper diagnosis and the proper referral." (Dahl Dep. at 5). "Ribbing [made] a diagnosis of corneal abrasion," according to Dahl, "based on an inadequate history and an inadequate physical." (Dahl Dep. at 9, 15). Dahl felt that the metal on metal nature of the injury should have made Ribbing "highly suspicious of a penetrating injury." (*Id.*). In Dahl's opinion, the examination he performed was inadequate because he lacked "sufficient illumination and magnification." (*Id*. at 102). Without those two things, "he should have realized that his examination would not be complete." (*Id.* at 102). He did say, however, that "[h]ad [his injury] been a corneal abrasion and solely a corneal abrasion, which it was not, his actions would have been appropriate." (Dahl Dep. at 54).

UCHD points to similar testimony by Hauswald. In his deposition, Hauswald testified that Ribbing's examination was inadequate to rule out a penetrating injury. (Hauswald Dep. at 34). In his opinion, Ribbing should have used flourescein, "attempt[ed] to do a corrective vision using either [Merritt's] glasses or a pin hole," and referred him "to see an ophthalmologist that day posthaste. (*Id*. at 11-12). He also faulted Ribbing for failing to use a "slit lamp," "the standard of care in examining the cornea." (*Id*. at 11). Hauswald thought it quite clear "that [a penetrating injury] was not diagnosed in the emergency department." (*Id*. at 12). Like Dahl, Hauswald testified that had

Merritt's injury "been a corneal abrasion, the treatment would have been appropriate." (Hauswald Dep. at 23).

Birnbaum also concluded that Ribbing came to the wrong diagnosis in Merritt's case. (Birnbaum Dep. at 23). In his opinion, Ribbing came to the wrong conclusion because he failed to perform a proper examination – the examination "should have included at minimum a CT scan of the orbit." (Birnbaum Dep. at 23). According to Birnbaum, his history alone was enough that "he should have been seen in an emergent setting by an ophthalmologist." (*Id*. at 24). Like Dahl and Hauswald, Birnbaum concluded that the application of an antibiotic like gentamicin and a patch are appropriate methods to treat a corneal abrasion. (Birnbaum Dep. at 25).

Merritt does not deny that his experts' testimony focuses on Ribbing's failure to perform the right examinations and failure to diagnose the actual injury. He denies, however, that the testimony submitted by UCHD shows that it is entitled to immunity. As Merritt accurately points out, there is no question that Ribbing treated Merritt: he applied the tetracaine for the spasms, applied the antibiotic ointment, applied a patch, told him his eye was scratched and told him to return the next day. He also cites the pleadings, where UCHD claimed Merritt "was negligent in failing to follow the orders and directions of his doctors in seeking care and treatment." (UCHD's Ans. at 5). Against this background, Merritt focuses on reports prepared by Dahl and Hauswald, which he attached to his response.

In his report, Dahl stated that Ribbing's "errors included the improper acquisition of the medical history, misunderstanding the significance of the history as obtained, a faulty and incomplete examination . . . , improper treatment and disposition, and inadequate instructions to the patient." (Dahl Rep. at 1). He also stated, the "care Dr. Ribbing provided to Merritt was

inappropriate, inadequate and deviated from accepted standards of medical care. The medications he provided could not have properly treated the condition." (Dahl Rep. at 2). Continuing, he stated, "Ribbing's negligent lack of recognition that Mr. Merritt had an ophthalmological emergency and merely telling the patient to wear a patch, take some medication and return on the following day . . . indicated to the patient that he had an insignificant injury." (*Id.*).

Merritt also points to Hauswald's report. In his report, Hauswald opined, "I believe Dr. Ribbing deviated from the appropriate standard of care concerning the history, examination, diagnosis and treatment." (Hauswald Rep. at 1). Expounding on the treatment aspect, he explained that "patching the eye rather than shielding it was beneath the standard of care" and "[t]reating the condition as [Ribbing] did also delayed the necessary treatment." (*Id.* at 2). Under the circumstances, "the care and delay here was inappropriate, constituted a deviation, and contributed to the loss of the eye." (*Id.*). Merritt also points to testimony Hauswald gave in his deposition, questioning whether the application of tetracaine was inappropriate. (Hauswald Dep. at 35). As a sort of parting shot, Merritt generally directs the Court to Hauswald and Dahl's depositions. (Plntf.'s Resp. to Def.'s Mem. Supp. Summ. J. at 9). General citations to the record, however, are patently insufficient and are not entitled to consideration. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 n.1 (7th Cir. 2006).

The real question in this case, as in most cases dealing with §§ 6-105 and 6-106, is whether Merritt's evidence of Ribbing's negligence extends beyond that related to examination and diagnosis. The Supreme Court of Illinois's decision in *Michigan Avenue National Bank v. County of Cook* is the most cited authority on the distinction between negligent examination/diagnosis and negligent treatment. Both parties rely on the case extensively in support of their respective

positions. In *Michigan Avenue National Bank*, the administrator of the estate of Cynthia Collins sued Cook County and the Cook County Hospital after Collins died of the breast cancer that defendants' doctors failed to diagnose. 732 N.E.2d at 531. Collins made a number of visits to the Cook County Hospital and its clinics between September 22, 1986 and February 10, 1987. During her first visit, a nurse found a lump in her left breast and referred her to the Hospital's breast clinic. At the clinic, she was diagnosed with fibrocystic breast disease and told to return in three months for a checkup, which she failed to do. *Id*. She went to the Hospital's emergency room several times in December 1986 and January 1987 complaining of breast soreness and other gynecological ailments. *Id*. at 532. During one of these visits, a gynecologist found a cyst in her right breast, but rendered no treatment. On February 10, 1987, she visited another of the Hospital's clinics, where another doctor found her breasts "within normal limits." *Id*. In July 1988, Collins was diagnosed with breast cancer; she eventually died of that ailment in November 1989. *Id*.

Based on the deposition testimony of several experts, the plaintiff claimed defendants' physicians deviated from the standard of care by failing to perform the proper examinations (including a mammogram and biopsy), failing to diagnose her condition as breast cancer and failing to administer the proper care. *Id*. at 533. The Supreme Court of Illinois began its analysis of plaintiff's claim by rejecting its contention that Section 6-105 is limited to "preventive health examinations performed for the public at large." *Id*. at 536. It held that 6-105 plainly immunized the defendants for failing to conduct or inadequately conducting their examinations. *Id*. Though it rejected the notion "that section 6-106 was . . . meant to grant blanket immunity for negligent treatment of a specific medical condition," it found that her allegations and evidence only supported defendants' negligence in failing to perform the proper examinations and their resulting failure to

diagnose that Collins had breast cancer. *Id*. at 538-39. Accordingly, the court held that defendants were entitled to immunity.

UCHD claims this case is similar to *Michigan Avenue National Bank* and indistinguishable from another medical malpractice action against Cook County, *Mabry v. County of Cook*, 733 N.E.2d 737 (Ill. App. Ct. 1st Dist. 2000). In *Mabry*, the plaintiff brought a medical malpractice action against Cook County and the Cook County Hospital (CCH) seeking damages for the death of his mother, Ada Pinkston. 733 N.E.2d at 738. While in the care of the Hospital, Pinkston died of a pulmonary embolism that her doctors never diagnosed. Pinkston initially went to the emergency room at CCH complaining of dizziness and shortness of breath. After performing several tests, Dr. Kling, an emergency room physician, diagnosed her with asthma. *Id*. One of the tests Kling ordered was an X-ray, which showed that Pinkston had "a three-by-four-centimeter rounded soft tissue density" where her pulmonary artery entered her lungs. Kling diagnosed this "hilar density" as a lymph node enlargement, infection, or malignancy, but did not diagnose a pulmonary embolism because Pinkston did not have the risk factors for that condition. *Id*. at 739. After Pinkston's condition failed to improve, she was admitted to CCH. While in the family practice ward, she was under the care of two residents, both of whom diagnosed her condition as asthma and found no evidence of a pulmonary embolism. *Id*. at 740. These doctors treated her condition with an anti-inflammatory steroid, nebulizers and oxygen. Over the next several days, Pinkston's condition improved marginally, but on her third day in the hospital, she died of the pulmonary embolism. *Id*. at 741.

Plaintiff's expert testified that Kling violated the standard of care by failing to perform a differential diagnosis and failing to take a proper history. He also testified that Kling misinterpreted

the results of several diagnostic tests and should have ordered additional tests to follow up on the tissue mass found in the lung. The expert came to similar conclusions regarding the residents. Despite the fact that the defendants had treated Pinkston, the court concluded that the plaintiff premised his cause of action on defendants' failure to diagnose the pulmonary embolism and their failure to conduct tests that would have shown that Pinkston suffered from a pulmonary embolism. *Id*. at 745.

Key to the court's holding was that no evidence "established that the treatment for Pinkston's asthma was negligent, improper, or related to the lack of treatment for the pulmonary embolism." *Id*. at 747. The treatment did not bring defendants within § 6-106(d) because Pinkston had asthma, as well as the embolism, and no evidence indicated that the treatment provided for asthma was improper or that it contributed to her death. *Id*. at 746-48. In the court's words, "the treatment for asthma was simply unrelated to the . . . misdiagnosis of her actual condition." *Id*. at 747.

Except for his initial application of the tetracaine, the treatment Ribbing prescribed for Merritt occurred after he diagnosed a corneal abrasion. Ribbing said so himself in his deposition, and all of Merritt's experts agreed. As to the tetracaine, Merritt has introduced no testimony that in using it, Ribbing deviated from the standard of care. In his deposition, Hauswald said he sometimes used tetracaine to perform a better investigation. (Hauswald Dep. at 35). He suggested that prescribing tetracaine was inappropriate, but there is no evidence that Ribbing prescribed it.

Like the doctors in *Mabry*, Ribbing *never* diagnosed the condition that caused Merritt to lose his eye. For purposes of this motion, there is no question that Ribbing breached the standard of care in both his examination and diagnosis. It is also clear that the treatment he prescribed was inappropriate in light of the *actual nature* of Merritt's injury. But what matters, and what is

ultimately dispositive here, is that Ribbing never treated the penetrating injury. *Mabry*, 733 N.E.2d at 747; *see also Antonacci v. City of Chicago*, 779 N.E.2d 428, 434-35 (Ill. App. Ct. 1st Dist. 2002); *Carr v. Cook County Hosp.*, 751 N.E.2d 119, 121-22 (Ill. App. Ct. 1st Cir. 2001). All Merritt's experts concluded that the course of treatment Ribbing prescribed would have been appropriate if Merritt really only had a corneal abrasion. When viewed in this light, it is clear that the fault lies in the missed diagnosis, not in the treatment. As such, Merritt's claim does not fall within the exception outlined in 6-106(d). *Carr*, 751 N.E.2d at 121.

Merritt's attempts to distinguish *Michigan Avenue National Bank* and *Mabry* and to liken this case to *Mills v. County of Cook*, 788 N.E.2d 169 (Ill. App. Ct. 1st Dist. 2003) are not persuasive. In *Mills*, plaintiff brought her baby to defendant's hospital because it had a cold and was coughing and wheezing. *Id*. at 170. The emergency room physician determined that the child had upper airway congestion and made a differential diagnosis of pneumonia – which meant she considered pneumonia a possible cause of the child's problems. The doctor ordered a number of tests and prescribed nubulizer treatments. The doctor discharged the child after its condition improved, but the child died several hours later. *Id*. The court rejected the defendant's claims of immunity under *Michigan Avenue National Bank* and *Mabry* because the record clearly showed that the doctor diagnosed the child's pneumonia. As plaintiff's expert testified that the care the doctor provided fell below the standard of care, the court found that defendant was not immune under the Tort Immunity Act. *Id*. at 171-72.

*Mills* provides no help to Merritt here because the physician there made the *correct* diagnosis, which Ribbing never did. *See* 788 N.E.2d at 171-72. Merritt points to the fact that the defendant in *Mills* (like UCHD) argued that its physician never diagnosed the pneumonia that caused

the child's death in *Mills*. The court rejected the argument because the physician admitted in her deposition that she made a differential diagnosis of pneumonia and plaintiff's expert and a nurse concluded that the physician diagnosed it. *Id*. at 172. Here, Merritt's own experts agree with Ribbing that he never diagnosed a perforation or penetrating injury.

One might distinguish *Mabry* from the case at bar for a couple reasons. First, the court held that defendants' treatment of Pinkston's asthma did nothing to worsen her condition. Here, the experts have opined that Ribbing's failures kept Merritt from receiving much needed emergency care from an ophthalmologist. Second, in *Mabry*, the decedent had two mutually exclusive conditions: asthma and the pulmonary embolism. Here, it is not clear whether a corneal abrasion is a lesser-included injury of a perforation or if the two are mutually exclusive. It is thus also unclear whether Merritt had a corneal abrasion and a perforation, or whether Ribbing just mistook the perforation for an abrasion. These unanswered questions and potentially distinguishing factors do not counsel, however, against relying on the holding in *Mabry* here.

In *Mabry*, the only appropriate treatment for the pulmonary embolism would have been an anticoagulant, which Pinkston's doctors never prescribed. 733 N.E.2d at 746. Here, as Dahl put it, "had an appropriate referral to an ophthalmologist been made by Dr. Ribbing on the date of the injury . . . and [Merritt] been examined by an ophthalmologist on that day, [Merritt] would, more probably than not, have had a significant chance of having his eye salvaged." (Dahl Rep. at 2). In both cases then, the failure to diagnose the injury caused the patient not to get the care needed. *See Mabry*, 733 N.E.2d at 748 ("[T]he negligence here is not based on the treatment Pinkston received, but on the treatment Pinkston should have received and the diagnosis the County physicians should have made."). Ribbing's failure to refer Merritt to an ophthalmologist worsened his condition no

more than the failure of Pinkston's doctors to give her the anticoagulant.

The holding in *Carr* alleviates the second concern noted above regarding *Mabry*. In *Carr*, the plaintiff injured his foot stepping on a piece of glass and went to the emergency room at defendant's hospital to get care. 751 N.E.2d at 120. After diagnosing a laceration, the ER physician, another defendant, cleaned the wound, sutured the skin, prescribed an antibiotic and discharged the plaintiff. The doctor failed to discover that the plaintiff had damage to his tendon. The court found defendants immune under the Tort Immunity Act because the doctor did not treat the injury to the tendons. *Id*. at 122. The same is true here. The undisputed evidence shows that Ribbing did not treat the perforation.

## CONCLUSION

UCHD's motion for summary judgment (Doc. 65) is **GRANTED**. Merritt's one and only claim against UCHD is hereby **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of this case.

**IT IS SO ORDERED**

**DATED: February 2, 2007.**

    s/ J. Phil Gilbert
**J. PHIL GILBERT**
U.S. District Judge